**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | | |
| ATLANTIC MEDICAL MANAGEMENT | : | |
| SERVICES, INC. and ATLANTIC SKIN | | |
| AND COSMETIC SURGERY GROUP, P.C., | : | **Case No.  07-14283 (JKF)** |
| | | **(Jointly Administered)** |
| Debtors. | : | |

_____

# MEMORANDUM OPINION

BY:   JEAN K. FITZSIMON
       United States Bankruptcy Judge


Before the court is the motion ("Motion") of debtors, Atlantic Medical

Management Services, Inc. ("Atlantic Medical") and Atlantic Skin and Cosmetic

Surgery Group, P.C. ("Atlantic Skin"), against Dr. Jonathon Pontell for violation of

the automatic stay as well as Dr. Pontell's cross-motion ("Cross-Motion") for

adequate protection.  The Motion asserts that Dr. Pontell violated the automatic

stay by taking property from Atlantic Skin's offices (the "Offices"). The Cross-

Motion contends that Dr. Pontell is entitled to adequate protection for certain

personal property which belongs to him, but which Atlantic Skin continues to use

in the operation of its medical practice.

An evidentiary hearing was held on these matters on January 16, 2008. At the conclusion of the hearing, the Court took the matter under advisement and granted the parties the opportunity to file post-hearing briefs which they did.[1] Shortly thereafter, the Court entered an Order directing Dr. Pontell to file a written account ("Written Account") of any and all items he removed from the Offices on or after the date upon which Debtors filed their bankruptcy cases. The Written Account which Dr. Pontell filed contains a number of items that were not mentioned in the Motion.[2]

Upon consideration, the Motion shall be granted in part and the Cross-Motion shall be denied.

---

[1] Debtors filed a post-hearing brief in support of their Motion and a reply brief. Dr. Pontell filed a post-hearing brief and a reply brief. Thereafter, Dr. Pontell filed a Motion to Strike Debtor's Reply Brief on the grounds that it "improperly attempts to introduce factual statements and documents after the evidentiary record was closed at the conclusion of the hearing on January 16, 2008." On March 17, 2008, the Court granted the Motion to Strike in part by ordering the exhibits from Debtors' Reply Brief to be stricken from the record.

[2] The following items on the Written Account were not identified in the Motion:

> 3 Blepharoplasty sets
> 3 Rhinoplasty sets
> 6 Scissors (including 2 dressing scissors)
> 10 Suture removal sets (including staple removers)
> 5 Bipolar forceps with cords
> Suction machine
> Prescription surgical loops
> Instrument cabinet
> 2 Calculators
> 2 Mirrors
> Personal Items (diplomas, desk with 3 chairs, plants, personal photos, music CD's, 2 CD players, personal papers)

See Statement of Jonathan Pontell, M.D. Pursuant to Order Dated January 23, 2008. See also Post-Trial Memorandum of Jonathon Pontell, M.D. at 4 (listing items on the Written Account that were not identified in the Motion). The items listed above from the Written Account, with the exception of Dr. Pontell's "Personal Items," shall be referred to as the "Subsequently Identified Items."

## BACKGROUND

### Debtors

Atlantic Skin provides dermatology services to its patients.  (Motion ¶ 8).[3]

Prior to filing for bankruptcy, it also provided plastic surgery treatment to its

patients through its employee, Dr. Pontell. (Motion ¶ 9).  When it filed for

bankruptcy, Atlantic Skin was treating patients at four locations, including its

locations in Malvern, Pennsylvania (the "Malvern Office") and Wilmington,

Delaware (the "Wilmington Office").  (Motion ¶11).

Atlantic Medical provides the administrative and management services for

Atlantic Skin. (Motion ¶ 10).  It also purchases the medical equipment and

supplies which are used in Atlantic Skin's practice.

### Dr. Pontell and the 1999 Employment Agreement

_____Dr. Pontell is a plastic surgeon.  In September of 1999, he entered into an

employment agreement (the "1999 Agreement") with Delaware Valley

Dermatology Associates, P.C. ("DVDA").[4]  Under the terms of this agreement,

Dr. Pontell was entitled to earn an ownership interest (ranging from a 1/3 interest

---

[3]  The facts for which citations to the Motion are given were admitted by Dr. Pontell in his response to the Motion.  The facts for which no citation is given were established at the hearing on this matter.

[4]  The 1999 Agreement was not admitted into evidence at the hearing on the Motion but it was attached as an exhibit to the Complaint and Dr. Pontell specifically referred to it in his Cross-Motion.  See Cross-Motion at ¶ 27.  Moreover, Dr. Pontell cited the 1999 Agreement in his post-trial memorandum in support of his contention that the 10 surgical packs, surgical headlamp and smoke evacuator (with attached pedal) are owned by him.  See Post-Trial Memorandum of Jonathon Pontell, M.D., at 5.

to 100% ownership depending on the amount of his gross receipts) in equipment

which DVDA purchased on his behalf.  According to Dr. Pontell, he was well

aware of the terms of the 1999 Agreement.  As Dr. Pontell explained, the reason

that he was "intimately" familiar with the provisions of the 1999 Agreement was

that, shortly after the first year of his appointment under that agreement, the

physicians who owned DVDA thought that he was doing much better with the

contractual arrangement than DVDA was.  They wanted to reduce his salary

substantially, but he refused.  In order to get out of the 1999 Agreement,

according to Dr. Pontell, the physicians dissolved DVDA.  At the time, Dr. Pontell

reviewed the 1999 Agreement multiple times with his attorney.  Dr. Pontell

testified that : (i) he was very well aware of the ownership rights which the 1999

Agreement gave to him; and (ii) the paragraph which granted him ownership

rights in the 1999 Agreement was "very clear."

*The 2001 Employment Agreement*

    In June of 2001, Atlantic Skin and Dr. Pontell entered into an employment

agreement (the "2001 Agreement").  (Motion ¶ 13).  None of the provisions of the

2001 Agreement state that Dr. Pontell was to acquire an ownership interest in

any of the equipment or supplies which Debtors purchased for Dr. Pontell's use.

Paragraph 10(C) of the 2001 Agreement  addresses Dr. Pontell's

compensation with subparagraph 10(C)(1)(f) focusing on "surgical supplies and

4

equipment used exclusively by [Dr. Pontell]." 2001 Agreement ¶ 10(C)(1)(f). This

subparagraph obligated Atlantic Skin to pay all expenses related to its practice,

including the expenses for purchasing surgical supplies and equipment related to

Dr. Pontell's "facial plastic and reconstructive surgery activities," but capped the

costs which Atlantic Skin was obligated to pay for such surgical supplies and

equipment at "Five Percent (5%) of Receipts per annum." 2001 Agreement

10(C)(1)(f). Dr. Pontell testified that the costs which Atlantic Skin expended

under Subparagraph 10(C)(1)(f) never got anywhere close to this cap. Based on

this paragraph, Dr. Pontell contends that he owns the surgical supplies and

equipment which Atlantic Skin purchased that were used exclusively by him.

***Debtors' Financial Problems and their Bankruptcy Filings***

In May of 2007, Atlantic Skin notified its physician employees, including

Dr. Pontell, that it was in financial distress and that it was, therefore, adopting

new operating guidelines that would reduce the physicians' compensation.

(Motion ¶ 14). After June 1, 2007, Dr. Saruk, who was the CEO of both Debtors,

and C.J. Papathomas, who was the business manager of both Debtors, had

many conversations with Dr. Pontell about the financial condition and prospects

of the Debtors. (Motion ¶ 15).

By letter dated June 28, 2007, Dr. Pontell, through his lawyers, asserted

that Atlantic Skin was in material breach of the 2001 Agreement and stated that,

unless Atlantic Skin cured the breach, Dr. Pontell's employment would terminate

30 days thereafter.  (Motion ¶ 16). Thirty days after the date of the letter was

July 27, 2007.

By letter dated July 23, 2007, Dr. Pontell advised Atlantic Skin that: (i) he

intended to maintain possession of the cell phone ("Cell Phone") that was used

by his Patient Care Coordinator; (ii) Atlantic Skin would have the Cell Phone

contract changed to his name and billing address; and (iii) depending upon which

practice opportunity he decided to accept, he may need to take certain equipment

and instruments that he didn't own and may also want to take some supplies with

him that Atlantic Skin had ordered for him.  (Exhibit D-2, paragraphs numbered 4

and 5).  Dr. Pontell suggested in the letter that the parties arrive at a price for the

equipment and instruments that he wanted to take.  At the time Dr. Pontell wrote

this letter, he believed that some of the equipment and items which he wanted to

take with him upon his departure from Atlantic Skin were owned by Atlantic Skin.

On July 26, 2007, the Debtors filed their bankruptcy petitions at 6:19 p.m.

and 6:26 p.m.  (Motion ¶ 4).  Pursuant to a motion by the Debtors, their

bankruptcy cases are being jointly administered.

***Dr. Pontell's Removal of Equipment and Supplies***

On July 26, 2007, after Debtors had filed their bankruptcy petitions,

Dr. Pontell removed the following items from the Wilmington office: five surgical

packs; some instruments out of six surgical packs ("Additional Instruments");

several packs of promotional brochures for plastic surgery procedures; a surgical

headlamp; and a pedal used in the operation of a smoke evacuator.[5]  (Motion

¶ 24).

The surgical packs which Dr. Pontell removed contained older instruments

that he testified were his from his employment at DVDA as well as newer

instruments from Atlantic Skin's practice.  Some but not all of the instruments

from Atlantic Skin's practice were embossed with Dr. Saruk's name or the name

of the practice.

Dr. Pontell testified that, when he began his employment with Atlantic Skin,

he brought ten surgical packs that he owned from his employment with DVDA to

the practice at Atlantic Skin.  He explained that the packs which he removed from

Atlantic Skin's office contained older instruments from his days at DVDA as well

as newer instruments from Atlantic Skin's practice because, from the first day that

any new packs were used, the old and new instruments ended up mixed together

by the end of the day.  Elaborating on this point, Dr. Pontell explained that he

used about 7 to 9 surgical packs daily in treating patients.  After he used each

pack, he would put the dirty instruments in a pile.  At the end of the day, the

---

[5]  At the hearing, Dr. Pontell testified that: (i) he started packing up the items which he took from the Wilmington Office after seeing his last patient at 4:00 p.m.; (ii) at some point during the evening, he took a break to have dinner; and (iii) he left the Wilmington Office at approximately 10:00 p.m.

operating room technician would clean the instruments, sort them into packs without regard to whether she was mixing older instruments with newer instruments and then sterilize them.

On the morning of Friday, July 27, 2007, Debtors' counsel had a telephone conversation with Fran McGinley, Esquire, who had represented Dr. Pontell at some point during the summer of that year, to advise her of the Debtors' bankruptcy filings and that it was Debtors' counsel's belief that Dr. Pontell had removed property from the Malvern or Wilmington offices in violation of the automatic stay.  On the morning of the same day, Debtors' counsel also had a telephone conversation with Dr. Pontell's wife who is an attorney and with whom he was instructed by Dr. Pontell to have all further communications.  (Exhibit D-3).  By e-mail at 12:52 p.m., Debtors' counsel sent Mrs. Pontell a letter confirming their conversation.  (Exhibit D-4).  In the letter, Debtors' counsel advised Mrs. Pontell that Debtors had filed for bankruptcy the previous day and that Dr. Pontell should return any equipment which he removed the previous day from the Wilmington Office.  (Id.)  Debtors' counsel also asked for a list of equipment which Dr. Pontell took.  (Id.).  Dr. Pontell failed to comply with these requests.[6]

---

[6] Debtors' counsel also sent written communications to Harry J. Giacometti, Esquire, who had also represented Dr. Pontell, advising him that Debtors' counsel believed that Dr. Pontell had violated the automatic stay by removing items from the Offices, that he should return the items and that he should

(continued...)

8

Later that same day, namely Friday, July 27, 2007, Dr. Pontell removed the following items from the Malvern Office: a smoke evacuator; five more surgical packs, an antique table, an antique wall unit, the Cell Phone and a transcription voice recorder.  (Motion ¶ 26).  The antique table and antique wall unit belong to Dr. Pontell.  (Id.).

Dr. Pontell did not take any original patient charts with him when he left his employment with Atlantic Skin.  He did, however, have copies of the charts made and took the copies with him.

By e-mail dated Monday, July 30, 2007, Dr. Pontell, through his wife, notified Atlantic Skin that, in addition to the surgical instruments which Dr. Pontell claimed belonged to him, he had taken the computer (the "Computer") which he used in the practice, the Cell Phone and a digital camera from the Malvern Office. (Motion ¶ 37 & Exhibit D-5).   Debtors' counsel responded to the e-mail by again reminding Mrs. Pontell that the removal of any equipment or supplies was a violation of the automatic stay and asking again for a list of the items which Dr. Pontell took from the Offices.  (Exhibit D-6).  Dr. Pontell never returned any of the items which he took from the Offices and never complied with Debtors' request to provide them with a list of the items taken, although he testified that he had at least a partial list of the items.

---

[6](...continued)
provide Debtors with a list of the items that he removed.

### *The Computer and the Surgery Simulation Software*

The Computer which Dr. Pontell took with him was purchased by him, but he was reimbursed for its cost by the practice.  The Computer has plastic surgery simulation software on it that Dr. Pontell uses for his patients.  While the original software was purchased by DVDA, Atlantic Skin or Atlantic Management purchased upgrades to the software which were loaded on the Computer.

On the Computer are "before" and "after" pictures for the individuals upon whom Dr. Pontell operated.  After Debtors filed for bankruptcy, Dr. Pontell was asked to provide Debtors with these pictures.  He agreed to comply with the request if he was supplied with a hard drive on which he would copy the hard drive from the Computer.  This exchange did not occur.

Dr. Pontell testified that he uses the Computer every day in treating patients and for documenting pre- and post-operation images.  He further stated that he could not do his job properly without using the Computer.  Furthermore, at the end of July, he had patients that he had seen at Atlantic Skin's practice who were scheduled for medical and surgical treatment with him.  He needed the Computer to continue treating these patients.

### *The Cell Phone*

The Cell Phone was originally purchased by Jill Gallogly while she was the Patient Care Coordinator for Dr. Pontell.  When she purchased the phone, the contract was put in her name and listed her social security number.  However,

10

she was reimbursed for the cost of the phone by the practice.  Initially, the

monthly statements for the phone's service were sent to Ms. Gallogly, but the

address for the monthly statements was subsequently changed to Atlantic Skin.

From the beginning, the practice paid the monthly bills for the phone service.

When she left her position with Dr. Pontell at Atlantic Skin, she passed the phone

along to the individual who replaced her.  During the summer of 2007, Dr. Pontell

contacted Ms. Gallogly and asked her whether she would be willing to transfer

the contract for the phone to him.  She agreed to do so and took the steps

necessary to have the contract put it in Dr. Pontell's name.

After Dr. Pontell left Atlantic Skin, the practice was without a plastic

surgeon.  As of the hearing date in this matter, Atlantic Skin was trying to recruit a

plastic surgeon.  If it is successful in doing so, the practice will again advertise

that it provides plastic surgery.  It wants to retain the phone number attached to

the Cell Phone because it spent substantial money advertising the number.  If

patients make referrals for plastic surgery to Atlantic Skin and provide that phone

number in connection with the referral, the call will go to Dr. Pontell instead of to

Atlantic Skin.

### *The Surgical Chair*

In March of 2004, either Atlantic Medical or Atlantic Skin purchased a

surgical procedure chair for the Malvern Office. In his cross-motion, Dr. Pontell

included the surgical procedure chair as one of the items which he owns that
Debtors still have in their possession.

## DISCUSSION

### I.  Debtors' Motion

*A.  Whether Dr. Pontell violated the automatic stay?*

Debtors contend that Dr. Pontell violated the automatic stay by removing
property from the Offices.[7]  Dr. Pontell disagrees, asserting the stay was not
violated as a matter of law because the property which he removed was not
"property of the estate" since he owned it.  Even assuming, for purposes of
argument, that Dr. Pontell owned all of the property which he removed from the
Offices, his removal of it still constituted a violation of the stay.

The automatic stay is one of the fundamental debtor protections supplied
by the Bankruptcy Code."  University Medical Center v. Sullivan (In re University
Medical Center), 973 F.2d 1065, 1074 (3d Cir. 1992).  Codified in § 362, the stay

---

[7] Dr. Pontell argues that the Motion should be denied because paragraph 19 of the Motion
alleges that "most of the equipment taken by Pontell was purchased by Debtor [Atlantic] Skin" even
though there are no supplies or equipment listed on Atlantic Skin's Schedule B.  The Court finds this
argument unpersuasive.  First, Dr. Pontell violated the automatic stay by removing property from the
Offices.  As explained above, the issue of who owned the property is irrelevant to that conclusion.
Second, while paragraph 19 of the Motion alleges that Atlantic Skin owned most of the equipment taken
by Dr. Pontell, the Motion also specifically: (i) refers to the computer as "Debtors' computer;" (ii) alleges
that Atlantic Management upgraded the simulation software that was on the computer; and (iii) asserts
that "[s]ome of the Removed Property is clearly owned by Debtors."  See Motion ¶¶ 38, 41.  In addition, in
the Motion's prayer for relief, Debtors seek, *inter alia,* an Order requiring Dr. Pontell to "return immediately
to Debtor [Atlantic] Management all property he or his agents removed from Debtors' Premises[.]"  Motion
at pg. 12(c).

prohibits, *inter alia* "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" after the filing of a bankruptcy petition.  11 U.S.C. § 362(a)(3).   This provision applies to "property of the estate" and "property from the estate."  This latter phrase includes "property in possession of the debtor" even though the property is not part of the estate.  In re The Moore & White Co., Inc., 83 B.R. 277, 281 (Bankr. E.D. Pa. 1988); Emerson Quiet Kook Corporation v. Marta Group, Inc. (In re Marta Group, Inc.), 33 B.R. 634, 642 (Bankr. E.D. Pa. 1983).  See also Proyectos Electronicos, S.A. v. Alper, 37 B.R. 931, 932 (E.D. Pa. 1983) (noting that §362(a)(3) stays any action to obtain possession of "property over which the estate has control or possession.").

In Cuffee v. Atlantic Business and Community Development Corporation (In re Atlantic Business and Community Corporation), 901 F.2d 325 (3d Cir. 1990), the Third Circuit observed that "[t]he language of Section 362 makes clear that mere possession of property at the time of filing is sufficient to invoke the protection of the automatic stay."  Id. at 328.  See also Chrysler, LLC. v. Plastech Engineered Products, Inc. (In re Plastech Engineered Products, Inc.), 382 B.R. 90, 106 (Bankr. E.D. Mich. Feb. 19, 2008) (noting that personal property need not be "owned" by the debtor for the automatic stay to apply); In re The Moore & White Co., Inc., 83 B.R. at 281 (ruling that the automatic stay applies to personal property in which the debtor holds a mere possessory interest); Turbowind, Inc. v.

Post Street Management (In re Turbowind, Inc.), 42 B.R. 579, 585 (Bankr. S.D.

Cal. 1984) (finding it unnecessary to determine whether debtor had a property

interest in machines because "[t]he language of §362 is clear that mere

possession of property is sufficient to invoke the protections of the automatic

stay."). Therefore, regardless of whether Debtors own the property which

Dr. Pontell removed, he violated the stay by taking it from the Offices and

retaining it in his possession.

**B.      Whether Dr. Pontell willfully violated the stay?**

Section 362(k) provides for "actual damages" for a willful violation of the

automatic stay. This section states, in pertinent part:

> [A]n individual injured by any willful violation of a stay
> provided by this section shall recover actual damages,
> including costs and attorneys' fees, and, in appropriate
> circumstances, may recover punitive damages.

11 U.S.C. § 362(k). In Cuffee, the Third Circuit defined the term "willful" as it is

used in the foregoing provision as follows:

> A "willful violation" does not require a specific intent to
> violate the automatic stay. Rather, the statute provides
> for damages upon a finding that defendant knew of the
> automatic stay and that the defendant's actions which
> violated the stay were intentional. Whether the party
> believes in good faith that it had a right to property is not
> relevant to whether the act was "willful" or whether
> compensation must be awarded.

901 F.2d at 329 (quoting In re Bloom, 875 F.2d 224, 227 (9th Cir. 1989)).

14

It is unclear from the record whether Dr. Pontell knew that Debtors had already filed for bankruptcy when he took the property from the Wilmington Office.  Therefore, he may have innocently violated the stay on that day.  However, after he had notice of the filings, he continuously refused to return the property to the Debtors or even provide them with a list of the property which he had taken.  Consequently, even if his violation of the stay was originally innocent, it became willful by his refusal to remedy the violation.  In re Gagliardi, 290 B.R. 808, 819 (Bankr. D. Colo. 2003) ("Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay.").  Moreover, when he removed the property from the Malvern Office, he had knowledge of the Debtors' filings.  Debtors' counsel notified Dr. Pontell's wife (with whom Dr. Pontell directed Debtors' counsel to communicate) on the morning of July 27, 2007, that Debtors had filed for bankruptcy and sent an e-mail to her confirming their conversation.  Therefore, Dr. Pontell willfully violated the stay on July 27, 2007, when he removed property from the Malvern Office.

## C.  What damages, if any, are Debtors entitled to recover?

Pursuant to § 362(k)(1), "an individual injured by any willful violation of the stay" is entitled to "recover actual damages, including costs and attorneys' fees[.]" 11 U.S.C. § 362(k)(1).  While this subsection "refers to an individual," the

15

language has "uniformly been held to be applicable to a corporate debtor."

Cuffee, 901 F.2d at 329 (citing Budget Service Co. v. Better Homes of Va., 804

F.2d 289, 292 (4th Cir. 1986)).

As relief for Dr. Pontell's wilful violation of the stay, Debtors seek: (i) the

return of all property which Dr. Pontell removed from their Offices; (ii) attorneys'

fees and costs;  (iii) additional actual damages which Debtors suffered as a result

of Dr. Pontell's violation of the stay; and (iv) punitive damages.

### (1) Return of Property

Debtors contend that Dr. Pontell should be ordered to return the items

which he removed from the Offices or pay compensatory damages equal to the

replacement value of any missing property.  The Court agrees.  Dr. Pontell shall

be ordered to return all of the property (except for his personal property) which he

removed from the Offices since he violated the automatic stay by taking it.  Upon

the commencement of Debtors' bankruptcy cases, Dr. Pontell was required by

law to seek leave from this Court by filing a motion for relief from the automatic

stay before removing property from the Debtors' Offices.[8]

---

[8]  To the extent that Dr. Pontell owns any of the items which he is being required to return to the Debtors, he is entitled to file a motion for relief from the stay seeking permission to lawfully remove such items from Debtors' Offices.  If he chooses to do so, Debtors shall be entitled to offer evidence on the issue of ownership as to any of the items for which they were unsuccessful at proving ownership at the hearing on January 16, 2008.

### (2) Attorneys' Fees and Costs

Since Dr. Pontell willfully violated the stay, an award of reasonable attorneys' fees and costs is appropriate.    See In re Mu'Min, 374 B.R. 149, 170 (Bankr. E.D. Pa. 2007) (ruling that debtor was entitled to actual damages in the form of an award of reasonable counsel fees under § 362(k)); In re Gagliardi, 290 B.R. 808, 820 (Bankr. D. Colo. 2003) (awarding reasonable costs and attorneys' fees as "actual damages" for violation of automatic stay).   Debtors' counsel shall be directed to file an application for approval of such fees and costs.  If the Debtor pursues actual damages, the fees incurred therewith, if reasonable, also shall be reimbursed by Dr. Pontell.

### (3)   Additional Actual Damages

At the hearing on the Motion, the Court advised the parties that, if the issue of actual damages (exclusive of attorneys' fees and costs) became relevant, an additional hearing would be scheduled to afford them the opportunity to present evidence of actual damages.  To the extent Debtors established ownership of any the items which Dr. Pontell removed from their Offices, the issue of actual damages has become relevant.[9]

---

[9]  In Debtors' Reply Brief in Support of the Motion for Recovery of Property and Damages as a Result of Pontell's Violation of the Stay, Debtors state: "To the extent that the Court rules that the Debtors have the burden of proof on ownership, they reserve the right to present additional evidence in support of the motion."  Debtors' Reply Brief at 4 n.1.  Debtors had the opportunity to present evidence in support of their Motion at the hearing on January 16, 2008.  Except for the issue of actual damages which the Court

(continued...)

At the hearing, the parties focused solely on the property which the Motion mentioned since, at that point, Dr. Pontell still had not provided a list of all of the property which he removed.  The Motion specifically mentions the following property:[10]

(i)     10 surgical packs (the "Surgical Packs");

(ii)    the Additional Instruments;

(iii)   Several packs of promotional brochures for plastic surgery procedures;

(iv)    Surgical headlamp;

(v)     Smoke evacuator and pedal;

(vi)    Digital camera;

(vii)   Transcription voice recorder;

(viii)  Cell Phone;

(ix)    Computer; and

---

[9](...continued)
advised the parties would be addressed, if necessary, at a subsequent hearing, it was Debtors' obligation to present all relevant evidence in support of their Motion, including evidence of ownership, at the hearing on January 16th.  Debtors will not be allowed a second bite at this apple.  However, since the Motion did not focus on the Subsequently Identified Items, Debtors will be granted the opportunity at the hearing on actual damages to offer evidence as to their ownership of the Subsequently Identified Items and any actual damages which they sustained relating to those items assuming they owned them.

[10]  The Motion also alleged that Dr. Pontell took patient charts with him but he specifically testified at the hearing that he had the charts copied but left the original charts at Atlantic Skin.  His testimony on the patient charts was not refuted.  However, for privacy concerns, Dr. Pontell shall be directed to return the copies which he made or had made of the aforementioned patient charts except for the copies pertaining to patients which he has treated since July 26, 2007.

(x)    Upgraded simulation software for the
       Computer.

The issue is whether Debtors established ownership of any of these items.

### Ownership of the Computer, the Upgraded Simulation Software, Ten Surgical Packs and Additional Instruments

Based on the evidence in the record,  Debtors established that Atlantic

Skin or Atlantic Medical purchased or paid for the Computer and the upgraded

simulation software used on it.  The evidence further shows that, while Dr. Pontell

or DVDA owned 10 surgical packs when Dr. Pontell began working for Atlantic

Skin, the Surgical Packs which Dr. Pontell removed from the Offices contained a

mixture of older and newer instruments.  The newer instruments were not owned

by Dr. Pontell or DVDA; accordingly, they were purchased by one of the Debtors

for Atlantic Skin's practice.[11]  Moreover, since Dr. Pontell testified that he only

brought ten surgical packs with him to Atlantic Skin's practice, one of the Debtors

also owns the Additional Instruments which Dr. Pontell removed from the

Wilmington Office.

Dr. Pontell contends that even though the Computer, the upgraded

simulation software on it, some of the instruments in the Surgical Packs and the

Additional Instruments were purchased by one of the Debtors, he owns them

---

[11]  At the hearing, the parties agreed that all items at issue were owned by Dr. Pontell, DVDA or one of the Debtors.

pursuant to paragraph 10(C)(1)(f) of the 2001 Agreement.  Having carefully

reviewed the 2001 Agreement, the Court is unpersuaded by this argument.

Paragraph 10 of the 2001 Agreement provides in relevant part:

> A.  For purposes of this Agreement, . . . . "Compen-
> sation" shall include base salary, as defined in
> Paragraph 10.B., additional (bonus) compensation as
> may be payable to [Dr. Pontell] in accordance with
> Paragraph 10.C and the cost of benefits specified in
> Paragraph 13 and any other benefit [Dr. Pontell] is paid
> by [Atlantic Skin], or indirectly when [Atlantic Skin]
> reimburses [Dr. Pontell] for the cost of the benefit paid
> by the [Dr. Pontell].

2001 Agreement ¶10(A).  This paragraph specifically defines Dr. Pontell's com-

pensation to include: (i) his base salary;[12] (ii) additional (bonus) compensation

payable in accordance with Paragraph 10.C.;[13] (iii) the cost of benefits specified

in Paragraph 13;[14] and (iv) any other benefits provided to Dr. Pontell by Atlantic

Skin.  Not included in this definition is any ownership interest in the surgical

supplies or equipment which Atlantic Skin purchased for Dr. Pontell's use.

Paragraph 10.C. sets forth the method for calculating Dr. Pontell's

compensation.  It also provides that Atlantic Skin was obligated to pay all

---

[12]  Paragraph 10.B. of the 2001 Agreement set Dr. Pontell's "base salary."  At least initially, his "base salary" was $300,000.

[13]  Calculation of the "bonus" is described in Paragraph 10.C.4 of the 2001 Agreement.

[14]  Paragraph 13 is specifically labeled "Other Benefits."

expenses related to its practice up to certain limits.  The subparagraph states, in

pertinent part:

    C.    Physician's compensation shall be calculated as follows:

        1.  [Atlantic Skin] shall determine the amount of revenues collected by Corporation during the period July 1, 2001 to December 31, 2001 and then each calendar year thereafter that were related to medical services rendered by Physician ("Receipts"). In addition, Corporation shall pay all expenses related to the Practice [which is defined to mean Atlantic Skin's practice]; provided, however, that Corporation's portion of those expenses listed below related to Physician's facial plastic and reconstructive surgery activities shall be limited as follows (and prorated for the period from July I, 2001 to December 31, 200I):

                * * *

        (f)  The costs associated with surgical supplies and equipment used exclusively by Physician shall be capped at Five Percent (5%) of Receipts per annum.

        2.  To the extent that the costs incurred in connection with the items listed above exceed the fixed limits, the excess amounts shall be referred to as "cost overruns" for purposes of the Compensation formula. The wages and benefits payable to the staff dedicated to support Physician shall be subject to reviews and raises in accordance with Corporation's policy and procedures manual. The annual limits set forth in subparagraphs (d) and (e) above will be subject to increase based on Corporation's policy applied uniformly to all Atlantic Physicians.

21

3.  The following table will be used to determine Physician's annual Compensation:

Compensation Earned and Payable
50% of Receipts up to $750,000, less cost overruns
55% of Receipts in excess of$750,000 but not exceeding
        $1,000,000, less cost overruns
60% of Receipts in excess of$1,000,000, less cost overruns

4.  By way of illustration, if Physician's Receipts were $1,100,000 for the year, his Compensation would be determined as follows:

| | | |
|---|---|---|
| 50% of $750,000 | = | $375,000 |
| 55% of $250,000 | = | $137,500 |
| 60% of $l00,000 | = | $ 60,000 |
| | | |
| Compensation | | $572.500 |

By way of further example, if the costs incurred for Physician's surgical supplies and equipment were $65,000, Compensation would be reduced by $10,000 as this category of expenses exceeded the cap of $55,000. Physician would be entitled to $562,500 of Compensation.

From the difference between the Compensation and the cost overruns would be subtracted the salary (and Corporation's share of the payroll taxes) paid to Physician for the calendar year. The balance, if positive, will be paid to Physician in the form of a bonus within thirty (30) days after the books have been closed for the period. The balance, if negative (that is, Physician has drawn more in salary than the Compensation due), shall be paid to Corporation by Physician within thirty (30) days of the date the reconciliation is presented to Physician by Corporation, or, in the alternative, if mutually acceptable Physician may reduce his draw in

22

the subsequent quarter(s) until the deficit is recovered
by Corporation.

2001 Agreement at ¶ 10(C).  This subparagraph of ¶ 10 explains the method for

calculating Dr. Pontell's "additional (bonus) compensation" to which paragraph

10(A) refers in defining Dr. Pontell's compensation.  While the subparagraph also

obligated Atlantic Skin to pay for all expenses (up to certain limits) associated

with its practice, including any surgical supplies and equipment used exclusively

by Dr. Pontell, it does not provide that Dr. Pontell acquired any ownership

interests in such supplies or equipment.

In direct contrast, the 1999 Agreement specifically provided for Dr. Pontell

to acquire an ownership interest in the equipment which DVDA purchased on his

behalf.  Pararaph 12 of the 1999 Agreement stated, in relevant part:

> If [Dr. Pontell]'s gross receipts for the first thirteen (13) months of his
> employment exceed $300,000.00 but are less than $400,000.00,
> [Dr. Pontell] shall have one-third (1/3) ownership of equipment DVDA
> has purchased on [Dr. Pontell]'s behalf.  If [Dr. Pontell]'s gross
> receipts exceed $400,000.00 but are less than $500,000.00,
> [Dr. Pontell] shall have two-thirds (2/3) ownership of said equipment.
> Should gross receipts exceed $500,000, it is understood that
> [Dr. Pontell] shall maintain full ownership in the equipment DVDA
> has purcahsed on his behalf[.]

1999 Agreement ¶ 12.  Dr. Pontell testified that he was intimately familiar with the

provisions of this earlier agreement and that he was well aware of the ownership

rights which the agreement gave to him.  He further testified that the paragraph

23

which gave him ownership rights under the 1999 Agreement was very clear.

Consequently, Dr. Pontell knew the type of language that could have been

included in 2001 Agreement to provide him with an ownership interest in the

surgical supplies and equipment which Atlantic Skin purchased for his use.  Yet,

such language is absent from the 2001 Agreement.  This difference between the

1999 Agreement and the 2001 Agreement provides further support for the

conclusion that the 2001 Agreement failed to provide Dr. Pontell with any

ownership interest in equipment or supplies purchased for his use in Atlantic

Skin's practice.

***The Cell Phone***

It is undisputed that the Cell Phone was originally purchased by Jill

Gallogly while she was employed by and for Atlantic Skin for her use as the

Patient Care Coordinator for Dr. Pontell and that she was reimbursed for its

purchase by the practice.  Moreover, it was the practice which paid the monthly

service bills for the Cell Phone and not Ms. Gallogly.  Soon after the purchase of

the Cell Phone, the address was changed on the monthly bills so that they were

sent to Atlantic Skin and not to Ms. Gallogly. Therefore, while the contract for the

Cell Phone may have remained in Ms. Gallogly's name, the Cell Phone certainly

did not belong to her, as she acknowledged in her testimony. It was purchased

and is owned by one of the Debtors since the practice paid for the phone and for

24

the monthly service.  This point is supported by the fact that when she left her

position at Altantic Skin, Ms. Gallogly did not take the telephone with her.

### *The Promotional Brochures, Surgical Headlamp, Smoke Evacuator and Pedal, Digital Camera and Transcription Voice Recorder*

Debtors failed to establish that the promotional brochures, the surgical

headlamp, the smoke evacuator and pedal, the digital camera and the

transcription voice recorder which Dr. Pontell removed from the Offices were

owned by either of them.

### *Summary*

Based on the evidence in the record, Debtors established ownership at the

January 16th hearing of the following items: the Computer, the upgraded

simulation software, the Cell Phone, some of the instruments in the Surgical

Packs and the Additional Instruments.  A hearing shall be scheduled at Debtors'

request to afford them the opportunity to present evidence of actual damages, if

any, which they sustained as a result of Dr. Pontell's removal and retention of

these particular items.

### (4) Punitive Damages

The bankruptcy court has discretion to impose punitive damages "in

appropriate circumstances" when it finds that a respondent committed a willful

violation of the stay.  See Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 203

(3d Cir. 2000).  See also 11 U.S.C. § 362(k)(1).

In this case, the Court concludes that punitive damages shall not be

granted for Dr. Pontell's removal of equipment and items from the Offices.

Dr. Pontell's motivation for removing property from the Offices was, at least in

part, to enable him to adequately serve his patients.  Moreover, since the

commencement of Debtors' bankruptcy cases, the relationship between Debtors

and Dr. Pontell has been adversarial.  Both sides have contributed to the ill-will

between them and the continuing high-drama that has characterized their

conflicts.

However, punitive damages shall be granted for Dr. Pontell's continuing

failure and refusal to provide Debtors with a list of the items which he removed

from the Offices despite Debtors' counsel's repeated requests that he do so.

Given that Dr. Pontell violated the automatic stay by removing the items from the

Offices, the Court finds Dr. Pontell's conduct in failing and refusing to provide a

simple list of the items taken, which in no way would have jeopardized his

position, to be egregious.  Punitive damages in the modest amount of $750.00

shall be awarded to Debtors.[15]

---

[15]  Based upon Dr. Pontell's career as a plastic surgeon, the Court concludes that a modest award
of $750 is within his ability to pay.

## II.  Dr. Pontell's Cross-Motion

In his Cross-Motion, Dr. Pontell contends that he owns the following

property and that Debtors have continued to retain possession of the property

without his permission:

> 8 Goretex chin implants
> 4 Goretex nasal implants
> 11 Moh's surgical recon packs
> 3 blepharoplasty sets
> 3 rhinoplasty sets
> 2 mayo surgical stands
> 1 surgical procedure chair
> miscellaneous supplies

Cross-Motion, Exhibit B.  Dr. Pontell seeks adequate protection of his interest in

this property ("Retained Property").  Since Debtors denied the allegations of the

Cross-Motion, see Reply of Debtors to Response of Johnathon Pontell, M.D. and

Cross-Motion for Adequate Protection and Related Relief ¶¶ 27-30, Dr. Pontell,

as the movant of the Cross-Motion, had the burden to prove ownership of the

items listed above.

At the hearing in this matter, there was no evidence presented with regard

to ownership of any of the Retained Property except Mr. Papathomas' very

specific testimony that Atlantic Medical purchased the surgical procedure chair for

the Malvern Office in March of 2004.  Based on this testimony, Dr. Pontell does

not own the chair and, therefore, he has no right to possess it.  His Cross-Motion shall be denied.

## CONCLUSION

The Motion shall be granted in part and the Cross-Motion shall be denied. Dr. Pontell shall be ordered to return all of the items which he removed from the Offices except for his personal items and Debtors shall be awarded punitive damages against Dr. Pontell in the amount of $750.00. Debtors' counsel shall be directed to file a fee application and, if they so desire, a request for a hearing on the issue of actual damages as to the items of which they have proven ownership.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| **ATLANTIC MEDICAL MANAGEMENT** | : | |
| **SERVICES, INC. and ATLANTIC SKIN** | | |
| **AND COSMETIC SURGERY GROUP, P.C.,** | : | **Case No.  07-14283 (JKF)** |
| | | **(Jointly Administered)** |
| **Debtors.** | : | |

_____

# ORDER

**AND NOW,** this 8th day of April, 2008, upon consideration of the Motion of

Debtors for an Order of Contempt for Violation of the Automatic Stay Pursuant to

11 U.S.C. §362(a), and for the Recovery of Damages, Legal Fees and Costs for

Willful Violation of the Stay Pursuant to 11 U.S.C. § 362(k) ("the Motion") and the

Cross-Motion for Adequate Protection and Related Relief (the "Cross-Motion") by

Dr. Pontell against Debtors;

**AND** a hearing having been held on the Motion and Cross-Motion on

January 16, 2008,

**AND** the parties having filed post-hearing briefs and reply briefs;

It is hereby **ORDERED**, for the reasons set forth in the accompanying

Memorandum Opinion, that:

1.      The Motion is granted in part.

2.      The Cross-Motion is denied.

3.      Within thirty (30) days hereof, Debtors' counsel shall file with the Clerk of Court and serve upon opposing counsel, in accordance with the Local Rules of Bankruptcy Procedure, an application for reasonable attorneys' fees and costs incurred in filing and litigating the Motion.  Dr. Pontell shall have fifteen (15) days to file an objection to the application.  If an objection is timely filed, then the application shall be scheduled for a hearing.  If no objection is filed, then the application shall be ruled upon without a hearing.

4.      Within five (5) days hereof, Dr. Pontell shall have the name on the contract for the cell phone changed to Altantic Skin.

5.      Within seven (7) days hereof, Dr. Pontell shall return all of the items which he removed from the Debtors' offices (including the Subsequently Removed Items as defined in the Accompanying Memorandum Opinion) except for the following personal items: Dr. Pontell's antique table, his antique all unit, his diplomas, his desk with three chairs, his plants, personal photos, music CD's, two CD players and his personal papers.

6.      Dr. Pontell shall return the computer to Debtors with all material existing thereon as of July 26, 2007, including but not limited to the original and upgraded simulation software, patient information and before & after pictures. Dr. Pontell shall copy for himself and then delete any information from the computer pertaining to his current patients to protect their privacy interests.  Dr. Pontell shall not copy or delete any other material from the computer, including but not limited to, the original or upgraded simulation software, patient information and patient before & after pictures.

7.      Dr. Pontell shall return the cell phone to Debtors with all information existing thereon.

2

8.      Dr. Pontell shall return all copies of the patient charts
        which he took with him from the Debtors' offices except
        for charts pertaining to patients who have been under
        his care since July 26, 2007.

9.      A hearing limited to the issue of actual damages shall be
        held upon request by the Debtors.  At such hearing,
        Debtors shall be entitled to present evidence of actual
        damages, if any, which they sustained as a result of
        Dr. Pontell's removal and retention of the following
        specific items: the computer, the upgraded simulation
        software, the cell phone, the ten surgical packs and the
        Additional Instruments (as defined in the Accompanying
        Memorandum Opinion).  In addition, to the extent
        Debtors were required, as a result of Dr. Pontell's
        removal and retention of the Subsequently Identified
        Items (as defined in the accompanying Memorandum
        Opinion) to replace such items for the practice, Debtors
        shall be granted the opportunity at the hearing on actual
        damages to present evidence: (i) that they needed these
        items for their practice during the period when
        Dr. Pontell possessed them; (ii) of the date upon which
        they replaced each of the items, if any; and (iii) of the
        amount which they paid to replace them.

10.     Punitive damages are awarded to Debtors in the amount
        of $750.00.  Dr. Pontell shall pay these damages to
        Debtors within fifteen (15) days hereof.

_____
JEAN K. FITZSIMON
United States Bankruptcy Judge

3

Copies to:

**Counsel for Debtors**
Mary Elisa Reeves, Esquire
Knapp McConomy Merlie LLP
1216 Route 113, P.O. Box 487
Chester Springs, PA 19425

**Counsel for Johnathon Pontell, M.D.**
Leonard P. Goldberger, Esquire
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

**United States Trustee**
David M. Klauder, Esquire
U.S. Trustee Office
833 Chestnut Street, Suite 500
Philadelphia, PA 19107